UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NANETTE KING, ) | |
| ) | |
| Plaintiff. ) | |
| ) | |
| vs. ) | No. 4:11CV2184 SPM |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of Plaintiff Nanette King for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). For the reasons stated below, the court affirms the Commissioner's denial of Plaintiff's application.

## I.
## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, Nanette Sheree King, is a forty-eight year old widow whose husband passed away in 2002 after six years of marriage. Before filing for disability, Plaintiff worked as an office manager for her husband's business until 2003 and then briefly worked as a cashier for a Shop N Save. From November 2003 until April 2009, she worked as a loss prevention manager for Macy's. (Tr. 25-26, 212). Plaintiff claims she became unable to work in April 2009 due to "severe headaches," "anxiety attacks," and "depression". (Tr. 26-27). On September 21, 2009,

1

Plaintiff filed for disability benefits, citing problems related to depression and anxiety. (Tr. 111-119, 154). That application was denied. (Tr. 40-41).

Plaintiff reapplied for benefits on May 20, 2010, citing bi-polar disorder, memory and concentration problems, tremors, insomnia, and fatigue, in addition to major depression and severe anxiety and social phobia. (Tr. 120-127, 128-131, 198). That application was also denied. On July 13, 2011, following a hearing, Administrative Law Judge Randolph E. Schum (the "ALJ"), found Plaintiff was not under a disability as defined by the Act. (Tr. 6-8). On November 15, 2011, the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stands as the final decision of the Commissioner.

**II.
STANDARD OF JUDICIAL REVIEW**

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th

Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## III.
## GENERAL LEGAL PRINCIPLES

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F. 3d at 942. If the claimant establishes these three steps and does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps Four and Five. *Id*.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.
## THE ALJ'S DECISION

Using the foregoing analysis, the ALJ in this case concluded Plaintiff was not disabled at Step Five. More specifically, the ALJ found that Plaintiff had the following severe impairments: obesity, headaches, depression and anxiety. (Tr. 11). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed that are medically equal to one contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12). The ALJ determined that Plaintiff's impairments prevented her from returning to her past relevant work. However,

4

Plaintiff retained the RFC to perform light work except that she should not work in a setting that includes constant/regular contact with the general public or perform work which includes more than infrequent handling of customer complaints. She was able to understand, remember, and carry out at least simple instructions and non-detailed tasks. (Tr. 13). The ALJ found that Plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as a hospital products assembler, small parts assembler, electronics assembler, and optical goods final assembler. (Tr. 17).

In appealing the Commissioner's decision to this court, Plaintiff's chief argument is that the ALJ's RFC determination is not supported by substantial evidence. More specifically, Plaintiff argues there is no medical evidence to support the ALJ's finding that Plaintiff has the RFC to perform work day in and day out. *See* Pl's Br., at 10-16. Plaintiff also argues that the ALJ improperly discarded the opinion of Plaintiff's treating physician, Dr. Tracy Fritz. Plaintiff contends that, as a result of the aforementioned errors, the hypothetical question posed to the vocational expert, on which the ALJ's decision is predicated, erroneously failed to capture the "concrete consequences" of Plaintiff's impairment. *See* Pl's. Br. at 16-17.

## V.
## DISCUSSION

### A.  THE ALJ'S RFC DETERMINATION

Plaintiff contends that the ALJ's RFC determination is not supported by "some" medical evidence, as required by the Eighth Circuit in cases such as *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2000) and *Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001). *See* Pl.'s Br. at 10-16. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting

*McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," a "claimant's residual functional capacity is a medical question." *Lauer*, 245 F.3d at 704 (8th Cir. 2001) (internal quotation marks omitted). Therefore, "some medical evidence" must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Id.; see also Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000).

In this case, the ALJ determined that Plaintiff had the RFC to perform light work except that she could not work in a setting that involved constant or regular contact with the general public, or perform work that included more than infrequent handling of customer complaints. The ALJ further determined that Plaintiff was able to understand, remember, and carry out at least simple instructions and non-detailed tasks. (Tr. 13). Plaintiff argues that this determination, which by implication means Plaintiff is able to work day in day out, is unsupported by any medical opinion evidence. I disagree.

**1. THE ADMINISTRATIVE RECORD**

The Administrative Record contains treatment notes from various providers who examined and/or treated Plaintiff for her psychological complaints between 2008 and 2011.

***a. Fenton Family Healthcare (Dr. Tonya Little and Dr. Tracy Fritz)***

Plaintiff's medical records reflect that Plaintiff sought treatment for anxiety and depression at Fenton Family Healthcare beginning in January 4, 2008. In 2008, she was treated primarily by Dr. Tonya Little, who saw her in January, February, March, June, and October of 2008. (Tr. 236-250, 256-259, 264-267). Dr. Little prescribed Wellbutrin,[1] Lexapro,[2] and

---

[1] Wellbutrin is a brand name for the drug bupropion, which is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html

alprazolam.³ As of Plaintiff's October 2008 visit with Dr. Little, Plaintiff was "doing well" despite "some personal anxiety." (Tr. 264).

Plaintiff began treating with Dr. Tracy Fritz at Fenton Family Healthcare on April 3, 2009. Plaintiff went to see Dr. Fritz for "worsening depressive symptoms," citing stressors such as work, financial issues, issues with the IRS following her spouse's death, her father's health, and her living situation with her sister. (Tr. 268). During a visit on April 15, 2009, Dr. Fritz noted that Plaintiff was under extreme stress at work and at home. (Tr. 289). Specifically, Plaintiff indicated she needed to be the primary caretaker for her ill father since her mother had recent cardiac problems. Dr. Fritz made adjustments to Plaintiff's medications and recommended that Plaintiff receive "patient education" and take a leave of absence from work. (Tr. 290).

Following a visit on May 11, 2009, Dr. Fritz indicated that Plaintiff was feeling a little better after making some adjustments to her medication on her own but indicated Plaintiff was "not doing well enough clinically to return to work at [sic] Loss Prevention Manager." Dr. Fritz made additional adjustments to Plaintiff's prescriptions and extended her leave for an additional month, to June 15th. (Tr. 304).

During a visit on May 26, 2009, Dr. Fritz indicated that Plaintiff had made some improvements, particularly with respect to her anxiety, but indicated that she would "extend off work date until July 15, 2009, based on continued depression which has not responded fully to treatment." (Tr. 309).

---

² Lexapro is a brand name for the drug escitalopram, which is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html
³ Alprazolam is a benzodiazepine and is used to treat anxiety disorders and panic disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html

On June 30, 2009, Dr. Fritz noted that Plaintiff had switched from Prozac to Pristiq[4] and was "feeling much better." Plaintiff was exercising at a gym daily and felt it helped her depression. Although Plaintiff exhibited a depressed mood, her behavior was normal and her judgment and thought content were normal. Dr. Fritz planned to continue Plaintiff on her current medication and reassess in two weeks. Dr. Fritz noted "Patient does not appear able to return to work at this time as loss prevention agent. Will reassess at follow up. Encouraged continuation of healthy diet and exercise program." (Tr. 317-318).

On July 14, 2009, Dr. Fritz noted Plaintiff felt "a little bit better on the Pristiq. Her mood is not so low." Upon physical examination, Dr. Fritz found her psychiatric condition to be "mildly improved overall." However, Dr. Fritz found Plaintiff "seems to be developing some activating symptoms" and concluded she "meets criteria for bipolar affective disorder." Dr. Fritz prescribed Topamax[5] "as [a] mood stabilizer" and referred Plaintiff "to psychiatry for further medical management." Dr. Fritz concluded, "Patient is not able to return to work at this time based on bipolar depression not adequately treated." Dr. Fritz recommended evaluation by psychiatry for assessing Plaintiff's return to work, and Plaintiff was instructed to schedule her referral to psychiatry. (Tr. 322-325).

On August 4, 2009, Dr. Fritz noted that Plaintiff had been taking Pristiq and feeling better since starting it. Although Topamax was prescribed, Plaintiff had not picked it up, citing "insurance problems." Plaintiff was having some trouble sleeping due to anxious thoughts but was exercising daily and eating well. Upon examination, Dr. Fritz found Plaintiff's mood and affect, behavior, judgment and thought content all to be "normal." (Tr. 328-329).

---

[4] Pristiq is a brand name for desvenlafaxine, which is a drug used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608022.html

[5] Topamax is a brand name for topiramate, which is a drug used to treat seizures to prevent migraine headaches. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

On September 4, 2009, Dr. Fritz noted Plaintiff was scheduled to see the new psychiatrist the last week in September. Dr. Fritz also noted Plaintiff was taking her medication and felt like her mood was "stable" although she was still down in terms of her mood overall. Dr. Fritz "encouraged" Plaintiff to "establish care as planned with psychiatry" and made some adjustments to her medication. (Tr. 333-334).

On October 16, 2009, Dr. Fritz noted that Plaintiff had been seen by Dr. Farida Farzana, a psychiatrist, who was "following closely with her." Dr. Fritz noted Plaintiff was due to see Dr. Farzana again "next month" and noted Dr. Farzana's recommendations for adjusting Plaintiff's medication. Upon physical examination, Dr. Fritz found Plaintiff's behavior, judgment, and thought content to be "normal" and Plaintiff's mood "anxious" but "pleasant." Dr. Fritz made the recommended adjustments to Plaintiff's medication. Dr. Fritz also indicated that Plaintiff was "[n]ot able to return to work," recommended follow up with the psychiatrist as planned, and stated, "will await clinical assessment on new regimen and reassess work status." (Tr. 382-383).

Plaintiff saw Dr. Fritz for follow up visits on November 23, 2009, December 21, 2009, and February 1, 2010. The treatment records from those visits make no further mention of treatment with Dr. Farzana or any other psychiatrist. As set out more fully below, the evidence is that Plaintiff did not pursue further treatment from Dr. Farzana. The treatment records from those visits are also silent about whether Dr. Fritz felt Plaintiff could or could not return to work. (Tr. 387-388, 396-397, 401-402).

What the treatment notes from the November, December and February visits do indicate is that, at each visit, Dr. Fritz found Plaintiff's depressive symptoms to be "chronic" problems that are "worsened by stress" and "relieved by medications," with the treatment providing "moderate relief." At the November and December 2009 visits, Dr. Fritz found Plaintiff's

9

behavior, judgment, and thought content "normal," but her mood "depressed." At the February 2010 visit, Dr. Fritz found Plaintiff's behavior, judgment, thought content, *and* mood were all "normal." (Tr. 387-388, 396-397, 401-402).

In addition to Dr. Fritz's treatment notes, the Administrative Record also contains a January 11, 2010 medical disability certificate from Macy's filled out by Dr. Fritz (the "Disability Certificate"). The form was a check-the-box-type form in which Dr. Fritz indicated that (i) Plaintiff had "an impairment which affects [her] ability to perform one or more major life activity; (ii) Plaintiff was "limited by [her] condition from performing one or more major life activity" and (iii) the limitation "affect[s] [Plaintiff's] ability to perform at work." (Tr. 216). Although the form asked Dr. Fritz to identify in narrative form the "major life activity(ies) which [the doctor] consider to be limited" and to "explain briefly how the [Plaintiff] is limited at work as a result," Dr. Fritz offered no such narrative. (Tr. 217).

Dr. Fritz indicated that Plaintiff was not "currently capable of performing all the essential functions of . . . her position without any special accommodations." Dr. Fritz further indicated that there were "no effective accommodations appropriate" to enable Plaintiff to perform the essential functions of her job. Finally, Dr. Fritz indicated on the form that she was unable to give a foreseeable return date, as "the leave is indefinite." (Tr. 217).

### b. *Dr. Farida Farzana*

Pursuant to Dr. Fritz's referral of Plaintiff to a psychiatrist, on September 24, 2009, Plaintiff saw psychiatrist Dr. Farida Farzana, with Psych Care Consultants. Dr. Farzana diagnosed Plaintiff with bipolar II disorder and hyperactivity and assessed Plaintiff with a Global Assessment Functioning ("GAF") score of 30.[6] Dr. Farzana noted Plaintiff had a blunted and

---

[6] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a

flat affect and a depressed and anxious mood, but found Plaintiff also had an intact thought process, no hallucinations, and intact memory, concentration, and insight/judgment. Dr. Farzana recommended Pristiq, Topamax, and Xanax (alprazolam) and scheduled a follow-up appointment within four weeks. (Tr. 228-231). However, Plaintiff testified that she only visited Dr. Farzana once and could not recall why she did not return to Dr. Farzana. (Tr. 28).

### c. *Grace Hill (Brenda Bush, LNP and John Rajeev, LCSW)*

Plaintiff was seen at Grace Hill Clinic on April 8, 2011, by Nurse Practitioner Brenda Bush for GERD and depression. After that visit, Nurse Bush made a behavioral health referral, and Plaintiff was told to continue with Pristiq. (Tr. 446-447).

On May 2, 2011, Plaintiff was seen by Mr. John Rajeev, LCSW, for depression. Mr. Rajeev diagnosed Plaintiff with major depressive affective disorder, recurrent episode severe degree, without mention of psychotic behavior. Mr. Rajeev noted Plaintiff's problems were related to finances, housing, and occupation and assessed Plaintiff with a GAF score of 70.[7] (Tr. 467-469).

Plaintiff saw Mr. Rajeev again on May 16, 2011. At that visit, Plaintiff reported that she had started walking, gardening, and photography, which she enjoys. Plaintiff reported she was "less depressed" and wanted to "continue to work on self-management goals." Mr. Rajeev diagnosed Plaintiff with Major depressive affective disorder and again related her problems to

---

hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[7] *See* Note 4, *supra*. A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 32.

finances, housing, and occupation. He assessed her GAF score as 70.[8] (Tr. 470-471). Mr. Rajeev's plan for Plaintiff following the visit was for Plaintiff to continue with prescribed medications and self-management goals and to start writing journals. (Tr. 470-471).

### d. *Plaintiff's Subjective Complaints*

In addition to the foregoing treatment records, the Administrative Record also contained Plaintiff's testimony about her subjective complaints as well as a Third Party Function Report submitted by Plaintiff's friend, Frances Bunse.

Plaintiff testified that she gets tension headaches sometimes on a daily basis and has actual migraines once every two or three months. (Tr. 28). When she does have tension headaches, they last "almost all day," roughly 16-18 hours out of the day. (Tr. 29).

Plaintiff also testified that she has a problem with stomach acid issues for which she takes Ranitidine and Tums, which help. (Tr. 29). Roughly three to four times a month, Plaintiff's stomach problems are so severe that she suffers from chronic diarrhea that would interfere with her work day. (Tr. 35).

Plaintiff testified that because of the anxiety and depression, she does not want to get out of bed a lot of days, does not want to take a bath, and does not want to see friends or talk to people. The anxiety and depression have also caused her to gain weight. (Tr. 29). Plaintiff testified that although her doctor tried several different medications to treat her depression, she had trouble finding one that worked. (Tr. 30). Plaintiff testified that she is no longer bathing and changing clothes every day, has erratic eating habits, and has crying spells four to five times a week that can last anywhere from a few minutes to an hour. (Tr. 32). Plaintiff indicated that her crying spells are triggered by stress or nervousness induced by being around people. (Tr. 33).

---

[8] It is unclear from the treatment notes whether Dr. Rajeev assessed Plaintiff's GAF score at the May 16th visit. The record states "Current GAF: 70 ***on 5/2/2011,***" making it unclear whether this was a new GAF score or merely a reference to the earlier visit.

Plaintiff further testified that she has anxiety attacks two or three times in a week or sometimes five times in a week. The episodes can last anywhere from an hour to four or five hours. Plaintiff is treating her anxiety with alprazolam and sometimes has to take two pills instead of one pill to control her anxiety. In addition to anxiety, Plaintiff suffers from sleeping problems, which she also treats with alprazolam. (Tr. 31). Those sleeping problems include the inability to fall asleep. (Tr. 33).

Due to her weight gain, Plaintiff has lower back pain and joint pain that she did not previously suffer from. (Tr. 32). Ms. Bunse's report was largely consistent with the subjective complaints cited by Plaintiff. (Tr. 176-184).

### 2. THE ALJ'S RFC DETERMINATION WAS SUPPORTED BY "SOME" MEDICAL EVIDENCE IN THE RECORD.

In support of his RFC determination, the ALJ considered the treatment records of Mr. Rajeev, which included his GAF scores of 70, reflecting only mild psychiatric symptoms. (Tr. 15, 468, 471). Notwithstanding Plaintiff's arguments to the contrary, the ALJ also considered the treatment records of Dr. Fritz. Noting that Plaintiff began treatment for depression prior to her alleged onset date of April 15, 2009, the ALJ found that Dr. Fritz's treatment records, together with records from other providers, reflect that Plaintiff's depression was consistently attributed to a number of situational stressors in her life, including work stress, financial problems, her parents' health problems, and tax problems that became known after her husband passed away. (Tr. 14, 237, 243, 247, 264, 268, 289, 294, 303, 308).

The ALJ also noted, and Dr. Fritz's treatment records reflect, that Plaintiff experienced some improvement with medication adjustments and when the stressors in her life were removed or minimized. (Tr. 14). As the ALJ correctly noted, "[i]f an impairment can be controlled by

13

treatment or medication, it cannot be considered disabling." *Roth v. Shalala*, 45 F.3d 279, 283 (8th Cir. 1995) (quoting *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir. 1993)).

The ALJ also noted that although Plaintiff received a referral for psychiatric treatment, other than one visit with Dr. Farzana on September 24, 2009, Plaintiff failed to seek additional care from a psychiatrist. Indeed, at the hearing, Plaintiff could provide no explanation for this failure. (Tr. 28). As the Eighth Circuit has held, "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Roth*, 45 F.3d at 283. In addition, the absence of any evidence of deterioration or change in Plaintiff's mental capabilities disfavors a finding of disability. *See Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir. 2000) (citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)).

Taken as a whole, the medical evidence in the record supports a conclusion that Plaintiff's depressive symptoms, which first appeared to worsen in 2009, were either improving or stabilizing by February 2010. Between February 2010 and March 2011, Plaintiff did not seek any treatment for her depressive symptoms. (Tr. 14, 401, 467). In stark contrast to the GAF score of 30 assessed by Dr. Farzana in September 2009, as of May 2011, Dr. Rajeev assessed Plaintiff with a GAF of 70 and prescribed a plan for Plaintiff to continue "self-management goals" and to start writing journals.

For all of the foregoing reasons, I find there was "some medical evidence" in support of the ALJ's determination that Plaintiff could perform work activity as long as it involved simple tasks and did not require stressful activities such as frequent contact with the general public or handling customer complaints.

### 3. THE ALJ WAS NOT REQUIRED TO GIVE CONTROLLING WEIGHT TO DR. FRITZ'S OPINIONS IN THE MEDICAL DISABILITY CERTIFICATE.

Plaintiff suggests that the Disability Certificate filled out by Dr. Fritz conclusively establishes that Plaintiff's conditions have rendered her incapable of engaging in any sustained work activity. Plaintiff contends the ALJ erred by concluding that Dr. Fritz's opinion was limited to Plaintiff's ability to return to her past work at Macy's. Plaintiff further contends that because the ALJ "discarded" Dr. Fritz's opinions in the Disability Certificate, the record was devoid of "some" medical evidence to support the RFC determination. *See* Pl.'s Br. at 13-16. These arguments lack merit for several reasons.

First, the ALJ's conclusion that Dr. Fritz's opinion was confined to Plaintiff's ability to perform her past job is supported by substantial evidence. Dr. Fritz's treatment notes consistently refer to job-related stress. In discussing whether Plaintiff could return to work, Dr. Fritz consistently noted that Plaintiff would be returning to work as a loss prevention "manager" or "agent." (Tr. 304, 318). These pointed references to Plaintiff's specific position, taken together with the fact that (i) Dr. Fritz consistently tied Plaintiff's symptoms to her job as a loss prevention manager and (ii) the disability certificate specifically asked about Plaintiff's ability to perform her job a loss prevention manager, support the ALJ's conclusion that Dr. Fritz's opinion was limited to Plaintiff's past work.

Second, Dr. Fritz's opinion in the Disability Certificate is not entitled to controlling weight even if it can be construed as an opinion that Plaintiff was unable to perform any work. Although a treating physician's opinion is generally given controlling weight, it is not inherently entitled to it. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). Statements by a treating physician that a claimant cannot be gainfully employed "are not medical opinions but opinions on the application of the statute, a

task assigned solely to the discretion of the [Commissioner]." *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991). Indeed, the Eighth Circuit has held that although medical opinions are relevant in determining precisely what claimant's physical impediments are, they are "not conclusive as to the ultimate question concerning whether the claimant's injuries are so severe that [s]he is prevented from doing productive work." *Nelson,* 946 F.2d at 1316-17. *See also* 20 C.F.R. §§ 404.1527(d)(1),(3); 416.927(d)(1),(3) (no special significance is afforded to opinions that a claimant is "disabled" or "unable to work").

In addition, for a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be "'inconsistent with the other substantial evidence in [the] case record.'" *Hacker*, 459 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). *See also Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). It is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that regard should not be disturbed so long as it falls within the "available zone of choice." *See Hacker*, 459 F.3d at 937-938.

Here, the ALJ concluded that Dr. Fritz's opinion in the Disability Certificate that Plaintiff was "unable to work" was inconsistent with her own treatment notes. (Tr. 15). As discussed above, Dr. Fritz described Plaintiff's problems with anxiety and depression as intensifying in the first three quarters of 2009 while she was dealing with a host of situational stressors. (Tr. 268, 289, 294, 308, 312, 317). However, Dr. Fritz also indicated that Plaintiff's depression improved with medication, and that her symptoms improved when she was not under as much stress. (Tr. 308, 317).

From November 2009 through her last appointment with Plaintiff on February 1, 2010, Dr. Fritz found Plaintiff's depressive symptoms to be "chronic" problems that are "worsened by

stress" and "relieved by medications," with the treatment providing "moderate relief." At the November and December 2009 visits, Dr. Fritz found Plaintiff's behavior, judgment, and thought content to be "normal" but her mood "depressed." At the February 2010 visit, Dr. Fritz found Plaintiff's behavior, judgment, thought content, *and* mood all to be "normal." (Tr. 387-388, 396-397, 401-402). To the extent that Dr. Fritz's opinions in the January 2010 Disability Certificate can be construed as finding Plaintiff's conditions rendered her incapable of performing any work, the ALJ's conclusion that it was inconsistent with Dr. Fritz's own treatment records was within the zone of choices available to the ALJ.

Finally, in formulating Plaintiff's RFC, the ALJ thoroughly considered all of the evidence of record regarding the effects of Plaintiff's impairments on her ability to perform work-related activities. For example, the ALJ noted that Plaintiff was caring for her ill parents during the period she alleged she was disabled (Tr. 13-14, 289, 308). The Eighth Circuit has held that complaints of disabling symptoms are inconsistent with the ability to serve as a primary caregiver for others. *See Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) ("The ALJ considered testimony by Brown that seemed inconsistent with limitations caused by the kind of pain Brown said she had, including that . . . she acted as the primary caregiver of her daughter with cerebral palsy, helping her bathe and tending to her needs whenever the part-time assistant was not present."); *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) ("[T]he ALJ discounted Eichelberger's complaints noting that she ceased employment at the same time she became the primary care giver to her grandchild.").

The ALJ also noted that despite alleging disabling levels of depression and anxiety, Plaintiff did not require any emergency or inpatient treatment for her psychiatric impairments

17

during the relevant period. (Tr. 14). The ALJ further noted that Plaintiff's testimony that her depressive condition resulted in poor hygiene was contrary to treatment records. (Tr. 15).

The RFC determination need only account for those impairments and limitations that the ALJ determines are credible. *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003). Based on all of the factors outlined above, the ALJ determined that, while Plaintiff had some limitation of her RFC due to her mental impairments, the evidence as a whole did not support a finding that her anxiety and depression were completely disabling. (Tr. 14-15). The ALJ's credibility determination and resulting RFC determination were well within the "zone of choice" and should be affirmed. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Travis*, 477 F.3d at 1042 ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.").

### B. THE HYPOTHETICAL TO THE VOCATIONAL EXPERT

Plaintiff argues that the ALJ erred because his hypothetical question did not account for all of her functional limitations. *See* Pl.'s Br. at 16-17. Although the hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations found credible by the ALJ. *See Heino v. Astrue*, 578 F.3d 873, 882 (8th Cir. 2009) (citing *Pertuis v. Apfel,* 152 F.3d 1006, 1007 (8th Cir. 1998)). As discussed above, the ALJ found that Plaintiff had some credible symptoms but concluded the record did not support a finding that her mental impairments imposed disabling limitations.

Specifically, the record showed that Plaintiff's symptoms were associated largely with situational stressors, including job stress, financial problems, and caring for her ill parents. Dr. Fritz repeatedly indicated that Plaintiff's depression and anxiety were partially controlled with medication, and by February 2010, mental status examinations did not reveal any serious

functional limitations. Despite the fact she had gone roughly one year without any treatment for her psychiatric impairments, in May 2011, Plaintiff was assessed with a GAF score of 70, reflecting only mild functional limitations. (Tr. 15, 467, 471). The ALJ accounted for Plaintiff's symptoms to the degree they were credible by incorporating a number of specific limitations in the hypothetical question including that she was limited to work involving simple instructions and non-detailed tasks, as well as no constant or regular contact with the general public or work involving more than infrequent handling of customer complaints. (Tr. 16).

Because the hypothetical question included those impairments the ALJ found credible, and excluded those he discredited for legally sufficient reasons, the vocational expert's testimony that Plaintiff could perform work existing in significant numbers was substantial evidence in support of the ALJ's determination. *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011); *Gragg v. Astrue*, 615 F.3d 932, 941 (8th Cir. 2010).

## VI.
## CONCLUSION

For all of the foregoing reasons, the court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of January, 2013.